IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PERCY-EDWARD PAIR, JR. # 213090          *

Plaintiff                                *

v.                                       *          Civil Action No. WDQ-14-1537

MARY JANE ROSE, Mailroom Manager,        *
LT. L. K. HARBAUGH,  Intel Officer,
                                         *
Defendants.

## MEMORANDUM OPINION

Pending is a Motion to Dismiss, or in the Alternative, a Motion for Summary Judgment filed by counsel for the Defendants, Mary Jane Rose, a mailroom manager at North Branch Correctional Institution ("NBCI"), and Lieutenant L. K. Harbaugh, a NBCI intelligence officer. (ECF 12). Percy-Edward Pair, Jr., *pro se*, who is an inmate at North Branch Correctional Institution, has filed a response in opposition. (ECF 14, 15).[1] Pair also filed a Cross-Motion for Summary Judgment with his declaration. (ECF 16).

Upon review of the papers and exhibits, the Court finds an oral hearing is unnecessary. *See* Local Rule 105.6 (D. Md. 2014). For reasons stated below, the Defendants' Motion (ECF 12), treated as a Motion for Summary Judgment, will be granted. The Plaintiff's Cross-Motion for Summary Judgment (ECF 16) will be denied.

---

[1] Pair's Motion for Leave to File an Amended Complaint (ECF 15) will be construed as a Motion to Supplement his Response in Opposition and granted by separate Order. Pair's Motion to Strike the Appearance of Defendants' counsel (ECF 9) will be denied.

## BACKGROUND

I.     Plaintiff's Claims

Pair brings this action pursuant to 42 U.S.C. § 1983 against the Defendants in their individual capacities, claiming that they violated his rights under the First, Sixth, and Fourteenth Amendments, and his right to due process. (ECF 3, p. 8). Specifically, Pair claims the Defendants conspired to obstruct his mail by intercepting and opening his outgoing mail "without there being clear and convincing evidence to warrant inspection." (ECF 3, p. 6). He alleges that all of his outgoing mail is forwarded by Mail Room Manager Mary Jane Rose ("Rose") to Lt. Harbaugh ("Harbaugh") for "unwarranted inspection." *Id.* Pair asserts that the Defendants obstructed his mail with the intent to prevent him from petitioning the government for redress of grievances, retaining a private investigator and counsel, reporting abusive and criminal activities; and exhausting his administrative remedies before the Commission of Correction and the Inmate Grievance Office ("IGO"). (ECF 1, p. 1, 3).

Pair states in his declaration that on September 29, 2011, February 29, 2012, July 18, 2012, and September 14, 2012, he sent mail concerning his "deliberate indifference claim" under ARP-NBCI-2022-11, to the IGO, but his mail never left the institution despite receiving confirmation otherwise from the mailroom. (ECF 1, ECF 16-3).[2] Pair has submitted the affidavit of fellow inmate Delmont Player who attests to volunteering to send materials to the IGO under his name for Pair. (ECF 3, ECF 14-2, ECF 16-3). Pair alleges the NBCI mailroom "has a long history of hindering prisoners from exhausting their administrative remedies with the Inmate Grievance Office and DOC headquarters," stating that in 2011 an Administrative Law Judge recommended an investigation of mail handling practices after inmate Jean Germain proved he

---

[2]   Pair has not submitted copies of the confirmations he references. (ECF 16-3).

had mailed an ARP to the IGO which did not reach its destination. *Id.* [3]

Pair also alleges that on or about August 15, 2013, he was prevented from hiring Sharon Wiedenfield, a private investigator, because the mailroom manager forwarded his letter intended for the private investigator to the intelligence office for an unwarranted inspection. (ECF 3, p. 3; ECF 14, p. 32). The intelligence officer forwarded the letter to the Internal Investigation Unit ("IIU") without notifying Pair. *Id.* Pair explains that he intended to hire a private investigator to obtain retired correctional officer Lieutenant Damon T. Thomas's address in order to serve him with a summons. (ECF 3, p. 6).

Pair seeks a declaratory judgment and injunctive relief to order the Defendants to cease opening, delaying and or discarding his outgoing mail and correspondence, and preventing him for exhausting his administrative remedies. He also requests compensatory damages and punitive damages. (ECF 3, p. 8).

II.     The Defendants' Response

Division of Correction ("DOC") mail policy is set forth in DOC directive DCD 250-1, which permits inmates to send and receive mail, reading materials, and publications. (ECF 12, Ex. 1). It reads in pertinent part:

> Outgoing mail will not be opened unless there exists clear and convincing evidence to warrant inspection. In this event, the reasons and inspection will be documented. The Managing Officer or designees shall make the decision to open and inspect outgoing mail and shall ensure that the reasons for and results of the inspection are documented. The Managing Officer or designees shall withhold outgoing mail only when it is found to contain contraband, is evidence of a violation of a rule and/or regulation, or is the basis for requesting an investigation by the Division of Correction Internal Investigation Unit or any law enforcement agency.

---

[3]   Pair also submitted an excerpt of a Motion to Remand filed by the Secretary of Public Safety and Correctional Services to remand an action for review to the IGO, which states "there have been long-standing issues with inmates' mail being sent and received, including legal mail, from NBCI." (ECF 14-2). The excerpt is unsigned and undated. *Id.*

*Id.* at 2.

Incoming and outgoing mail, reading materials or publications, except packages, are not held for more than 24 hours, excluding weekends and holidays, except in cases where contraband is found. *Id.* at 4. In cases in which outgoing mail is held for more than 24 hours, the inmate is provided a written statement that describes the materials withheld and sets forth the justification or reason(s) for the action. The written statement is served on the inmate within 48 hours after the decision to withhold materials is made. The decision may be appealed. *Id.* at 4.

Defendants have also submitted declarations in support of their Motion for Summary Judgment. Lieutenant Harbaugh ("Harbaugh") explains in his declaration that incoming non-legal mail may be opened and read without a mail cover. (ECF 12, Ex. 2). Outgoing mail may be read when the inmate has a "mail cover" [4] instructing the mailroom to set the inmate's letters aside. When there is a mail cover, an intelligence officer will read the mail. If mail is withheld, a form is completed to notify the inmate. If mail is not withheld, the letter is copied and placed back in the outgoing mail.

Harbaugh attests that Pair was placed on the mail cover list on September 3, 2013. *Id.* Pair is a validated member of the Black Guerilla family who has been known to obtain personal information of staff members through his incoming mail. *Id.* at ¶¶ 12, 13. Pair is in administrative segregation housing because he is a known gang member and has threatened staff members. *Id.*; *see also* Ex. 5 at ¶¶ 9, 10.[5] Inmates on administrative segregation may mail a letter in the tier mailbox or by giving it to an officer to place in the mail. *Id.* ¶ 5. Harbaugh

---

[4] A "mail cover" indicates that an inmate's mail is to be set aside for reading. an intelligence officer generally returns the mail within one hour after review. (ECF 12, Ex. 4).

[5] Pair attests that he has never been charged with or accused of making threats to staff members or officers. (ECF 16-3).

4

attests that Pair's letters have been intercepted in accordance with DOC mail policy. *Id.* at ¶ 7. Notably, Pair states a "mail cover" was not authorized when he mailed his August 15, 2013, letter to the private investigator. (ECF 16-3).

Harbaugh further attests that he never forwarded any of Pair's mail to the IIU, tampered with Pair's mail, or prevented it from reaching its final destination. *Id.* ¶¶ 14, 15. All of Pair's outgoing mail was placed in the mail after inspection by the Intelligence Office. Harbaugh states the only time he spoke to Pair about his mail was after a letter was found on the tier floor on February 9, 2014. *Id.* at ¶ 16. Harbaugh explains:

> The letter was not in the tier mailbox; but rather, was found on the tier floor like trash by staff members. The staff members forwarded the letter to the Intelligence Officer because it contained threats to NBCI staff. The letter discussed Jeff Hammond, a known BGF leader and was signed from "True Gorilla, Ndimi Supreme," a name inmate Pair is known by. Because the letter was found on the floor like trash, mail policies do not apply.

*Id.*

Mary Jane Rose ("Rose") manages the NBCI mailroom. Rose states in her declaration that once outgoing mail is brought to the mailroom, it is sorted, the inmate's account is checked for sufficient funds, stamps are affixed to the mail, the mail is placed in a United States Postal Service bin, and the mail is taken to the Post Office. (ECF 12, Ex. 4). If an inmate has a "mail cover" instructing that their mail be set aside for reading, an intelligence officer generally returns the mail within one hour after review. (ECF 12, Ex. 4). Rose attests that she has not tampered with Pair's mail or prevented it from reaching its final destination. *Id.* Pursuant to DOC policy, all of Pair's outgoing mail is placed in the mail within 24 hours after reaching the mailroom. Rose states that to the best of her knowledge " at no time has Pair's mail, legal or otherwise been delayed, withheld, tampered with, lost or not processed" at NBCI. *Id.* ¶ 9.

Sergeant David Barnhart of the NBCI Intelligence Office states in his affidavit that on October 1, 2013,[6] an outgoing letter was intercepted in which Pair was trying to obtain personal information about recently retired correctional officer Lt. Damon Thomas. Barnhart states that to the best of his recollection, no one went to speak to Pair concerning the intercepted letter. Prior to this incident, Barnhart and Lt. Damon Thomas talked with Pair concerning his attempts to obtain personal information about NBCI staff members. When asked why he needed this information, Pair replied, "Because I need to know where they live if I'm going to put a lien on their home." (ECF 12, Ex. 3). Barnhart attests that Pair has "received or attempted to receive personal and privileged staff information on some six (6) known occasions in the last eighteen (18) months or so." *Id.*

Barnhart also explains that Pair claims to be a Sovereign Citizen and labels his mailings in such a way to denote his sovereign status. For example Pair will write his name as "Percy-Edward, Jr: Pair." *Id.* The style he uses to label his mailing raises suspicions about the contents of his mail.[7]

---

[6]   Pair is complaining about the unwarranted opening of his August 15, 2013, letter to Wiedenfield. (ECF 14-2). Defendants' reference a letter concerning hiring Wiedenfield that was intercepted sometime in October of 2013. (ECF 12, Ex. 3). Pair avers that this was his second letter to Wiedenfield, and it was dated September 30, 2014. (ECF 14-1, p. 9).

[7]   This Court takes notice that the United States Court of Appeals for the Third Circuit described the "redemptionist' theory or the related "sovereign citizen" theory as follows:

"Redemptionist" theory ... propounds that a person has a split personality: a real person and a fictional person called the "strawman." The "strawman" purportedly came into being when the United States went off the gold standard in 1993, and, instead, pledged the strawman of its citizens as collateral for the country's national debt. Redemptionists claim that government has power only over the strawman and not over the live person, who remains free. Individuals can free themselves by filing UCC financing statements, thereby acquiring an interest in their strawman. Thereafter, the real person can demand that government officials pay enormous sums of money to use the strawman's name or, in the case of prisoners, to keep him in custody. If government officials refuse, inmates

Detective Rodney Likin ("Likin") of the IIU states in his declaration that on June 21, 2013, the IIU received a letter from another inmate alleging that several inmates affiliated with the BGF were conspiring to harm Lieutenant Damon Thomas (Thomas"). (ECF 12, Ex. 5).

October 25, 2013, Lieutenant Thomas told Likin that Sergeant Barnhart ("Barnhart") had intercepted an outgoing letter from a BGF member who was attempting to obtain Thomas' home address. *Id.* Likin obtained a copy of the letter from Barnhart on October 28, 2013.  In the letter, Pair sought Wiedenfield's assistance to obtain Thomas' home address. *Id.*  The letter was not assigned an IIU case number. Instead, the letter became part of Criminal Investigation Report 13-35-00886, an investigation into the threat on Thomas by the BGF.

On November 1, 2013, Likin interviewed Pair about the letter. *Id.* Pair confirmed that he prepared the letter and explained the reason he wanted Thomas' home address was to discover whether he had paid his real estate taxes.  If Thomas had not, Pair intended to pay the taxes so that he could put a lien on the property. "Inmate Pair also advised he was placed on administrative segregation because he attempted to obtain several other staff members addresses." *Id.* ¶ 9.

Pair has filed six administrative remedy procedure ("ARP") requests related to his mail since 2012. (ECF 12, Ex. 6). On July 7, 2012, Pair filed NBCI-1771-12, complaining his outgoing mail was not being received by the addressees. On August 6, 2012, Pair filed NBCI-2139-12, complaining Officer Murray was mishandling his mail. On October 9, 2012, Pair filed NBCI-2760-12, complaining Captain Bohrer ordered Pair's mail forwarded for review or

---

are encouraged to file liens against correctional officers and other prison officials in order to extort their release from prison. Adherents of this scheme also advocate that inmates copyright their names to justify filing liens against officials using their names in public records such as indictments or court papers.

*Monroe v. Beard,* 536 F.3d 198, 203 n. 4 (3d Cir. 2008) (citation omitted).

confiscated. On April 26, 2013, Pair filed NBCI-1034-13, complaining the mailroom was reading his incoming mail. This ARP was dismissed for procedural reasons. On November 5, 2013, Pair filed NBCI-3692-13, complaining DOC mail procedures were not followed and that he had learned from the IIU detective that his letter to a private investigator was withheld. On November 27, 2013, Pair filed NBCI-4042-13, complaining his outgoing certified mail was not reaching its destination. *Id.*

On February 7, 2014, Pair filed a grievance in the Inmate Grievance Office ("IGO") as an "appeal" from the disposition of ARP-NBCI-3692-13. Pair complained that his mail to private investigator Sharon Wiedenfield had been opened and inspected by DOC staff and turned over to IIU. (ECF 12, Ex. 7). The grievance was dismissed on May 9, 2014, after Pair did not respond to the IGO's April 9, 2014 letter directing him to provide copies of the ARP documentation required by COMAR 12.07.01.04(B)(9)(a) within 30 days or his grievance would be administratively dismissed. Pair has not filed any subsequent Maryland Circuit Court proceedings for judicial review of this final administrative decision.

Scott Oakley, Executive Director of the IGO, attests his office has record of only one grievance filed by Pair since August of 2009, ARP-NBCI-3692-13. The ARP grievance complained outgoing mail from Pair to private investigator Sharon Wiedenfield had been opened and inspected by DOC staff and sent to the IIU. (ECF 12, Ex. 7). The grievance was administratively dismissed on May 9, 2014, when Pair failed to provide copies of the ARP documentation. *Id.*

## STANDARD OF REVIEW

"When matters outside the pleading are presented to and not excluded by the court, the 12(b)(6) motion shall be treated as one for summary judgment and disposed of as provided in

8

Rule 56." *Laughlin v. Metro. Wash. Airports Auth.,* 149 F.3d 253, 260–61 (4th Cir. 1998) (quoting Fed. R. Civ .P. 12(b)) (internal quotation marks omitted). Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970)). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48 (alteration in the original).

A "material fact" is one that might affect the outcome of a party's case. *Id.* at 248; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.,* 264 F.3d 459, 465 (4th Cir. 2001) (citing *Hooven–Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *accord Hooven–Lewis*, 249 F.3d at 265. Here, because the Court will consider matters outside of the pleading, Defendants' Motion will be construed as a Motion for Summary Judgment.

Because Pair is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89 94 (2007).

9

DISCUSSION

The Defendants raise lack of exhaustion of administrative remedies, Eleventh Amendment immunity,[8] and qualified immunity as affirmative defenses. They assert that Pair has alleged no plausible claim regarding a conspiracy to prevent him from sending mail.

I.      Exhaustion

Title 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Proper exhaustion of administrative remedies demands compliance with an agency's deadlines and other critical procedural rules because "no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90–91, (2006). Exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the inmate. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendant(s). *See Jones v.* Bock, 549 U.S. 199 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407

---

[8] The Defendants are sued in their individual capacities. (ECF 3). To the extent Pair seeks monetary damages against the Defendants in their official capacities for constitutional violations, he is barred by Eleventh Amendment immunity. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). States and their officers, sued in their official capacities, are not "persons" subject to suit for money damages under Section 1983. *Will*, 491 U.S. at 71; *Johnson v. Maynard*, Civ. Action No. ELH–12–2692, 2013 WL 4176958, at *5 (D. Md. Aug. 12, 2013).

F.2d 674, 682 (4th Cir. 2005). The exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *See Chase v. Peay*, 286 F.Supp.2d 523, 530 (D. Md. 2003); *see also Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943–44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Prison officials may not take unfair advantage of the exhaustion requirement, however, and a remedy becomes "unavailable" if prison employees do not respond to a properly filed grievance, or if they otherwise act to prevent a prisoner from exhausting his administrative remedies. *See Moore v. Bennett*, 517 F.3d 717, 725 (4th Cir. 2008).  To be sure, if prison officials hinder an inmate's efforts to exhaust a prisoner may be excused from exhaustion requirements. *See Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir.2003); *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir. 2001). A court may excuse a prisoner's failure to exhaust an administrative remedy if a prisoner "through no fault of his own, was prevented from availing himself of the remedy. *Id.* The burden of showing that administrative remedies were unavailable lies with the plaintiff. *See, e.g., Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011) (unpublished) ("[I]n order to show that a grievance procedure was not 'available,' a prisoner must adduce facts showing that he was prevented, through no fault of his own, from availing himself of that procedure." (citing *Moore*, 517 F.3d at 725)).

The Defendants assert that Pair failed to properly exhaust his mail claims because according to IGO records, he has filed only one grievance. That grievance concerned a deliberate

indifference claim which was dismissed after Pair failed to timely provide required supplemental information. Pair counters that he has been prevented from administratively exhausting his IGO grievance, and in support filed the declaration of fellow inmate Delmont Player, who attests Pair told him that the mailroom was preventing his mail from going out, so Player volunteered to mail Pair's ARP documents to the IGO for him. Player states in his declaration that on April 23, 2014, he mailed ARP-NBCI-3692-13 to the IGO on behalf of Pair. (ECF 16-3).

In light of information presented to the court, whether Pair's attempts to file grievances were impeded or the administrative process was unavailable to him is an open question. Thus, this case will not be dismissed on the basis of failure to exhaust administrative remedies. However, even if exhaustion requirement was excused, Pair has failed to plead any constitutional violation.

B.    Mail Claims

Prisoners have a right First Amendment right to send and receive mail. *See Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006). "Simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). "The curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of institutional needs and objectives of prison facilities." *Hudson v. Palmer*, 468 U.S. 517, 524 (1984). Prison officials may adopt regulations that impinge on a prisoner's constitutional rights if those regulations are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Legitimate penological interests include preserving prison security and maintaining order and discipline. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). The Supreme Court has "afforded considerable deference to the determinations of prison

12

administrators who, in the interest of security, regulate the relations between prisoners and the outside world." *Thornburgh*, 490 U.S. at 408.

A search of outgoing mail is permissible for security purposes, such as searching for contraband or escape plans. *See Altizer v. Deeds,* 191 F.3d 540, 549 (4th Cir. 1999) ("Because there is a substantial governmental interest in censoring certain materials from an inmate's outgoing mail, *e.g.*, materials detrimental to the security, good order, and discipline of the institution, or dangerous to the public, there is a fortiori a legitimate penological interest in opening and inspecting an inmate's outgoing mail for such material."); *United States v. Cook*, 457 F. App'x 285, 286 (4th Cir. 2011) ("[T]he search of [the defendant's] outgoing mail by jail officials did not violate the Fourth Amendment."). Isolated incidents of mail mishandling do not show an actionable pattern of practice. *See Buie v. Jones* 717 F. 2d 925, 926 (4th Cir. 1983).

Pair alleges that the Defendants conspired to obstruct his mail by intercepting and opening his outgoing mail without clear and convincing evidence on September 29, 2011, February 29, 2012, July 18, 2012, and September 14, 2012. Notably, Pair attests to filing over 81 ARPs/Grievances since August of 2005. (ECF 13-3, p. 5). Thus, the concerns he expresses are premised on a specific, isolated, and anomalous occurrence. This is not, however, to disparage the import of his concerns. Assuming for the sake of argument that the letters were in fact mailed by Pair or his designee to the IGO, the Court is troubled that four letters failed to reach the IGO. Nevertheless, Pair provides no facts to suggest these letters were intercepted or improperly handled by Defendants.

Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 821 (1977). The right is not without limits. The Supreme Court stated in *Lewis v. Casey*, 518 U.S. 343, 355 (1996):

13

> Bounds does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.' " *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 355). Actual injury occurs when a prisoner demonstrates that a "non-frivolous" and "arguable" claim was lost because of the denial of access to the courts. *Lewis*, 518 U.S. at 352–352. "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Id.* at 349.

Further, a prisoner claiming denial of access to the courts must ultimately prove he suffered an actual injury by showing that the defendant's acts hindered his ability to pursue a non-frivolous legal claim.[9] Conclusory allegations are not sufficient. *See Wardell v. Duncan*, 470 F.3d 954, 959 (10th Cir. 2006) (denying access to court claim based on allegation that petition for a writ of certiorari had, for unspecified reasons, been dismissed and where plaintiff did not even mention the point on appeal). The right of access to the courts is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopherv. Harbury*, 536 U.S. 403, 415 (2002).

---

[9] Pair indicates without specificity that that several "judicial reviews" were dismissed by "circuit court" because Defendants prevented mail from leaving NBCI in order to "shield officers and staff members from lawsuits." (ECF 16-3).

Pair does not particularize the "deliberate indifference" claim raised in his ARP. He sets forth no specific facts or evidence to show that he suffered harm or was otherwise prevented from raising those claims in court. Simply put, his general allegations are insufficient to state a claim of denial of access to the courts. The Constitution creates no entitlement to grievance procedures or access to such procedures voluntarily established by a state. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).

Pair does not dispute that he is a member of the BGF.[10] Neither does he dispute that he has received or attempted to obtain personal and privileged staff information on six known occasions. Regarding Pair's letter to Sharon Wiedenfield, the record shows that as early as June 21, 2013, the IIU received information that several BGF affiliates were conspiring to harm Lieutenant Thomas. Pair was a documented member of the BGF. Prior to interception of the letter to Wiedenfield, correctional officers had talked with Pair concerning his attempts to obtain personal information about corrections officers. Pair's September 30, 2013, letter to Weidenfield letter was subject to the mail cover procedure. Pair 's August 15, 2013 letter to Weidenfield appears to have been read before the mail cover was implemented. Under these facts, the intelligence information concerning a threat of physical harm to Lieutenant Thomas by BGF family members, coupled with Pair's stated record of threatening correctional officers and obtaining their private information, amounts to clear and convincing evidence to warrant inspection of the letter. Whether the letter was processed in accordance with policy is unclear. A

---

[10] Pair does not dispute he is a member of the BGE. He states only "Plaintiff never alleged that he was a member of the Black Guerilla Familly ("BGF"); therefore the court should not presume it to be true." (ECF 14-1). Similarly, he states that he "never alleged that he was a Sovereign Citizen . . . ." *Id.* In another document, he states he "was a low ranking member of the Black Guerilla Family (BGF) for five years." (ECF 14-2). Pair states he "renounced himself two years ago from the Black Guerilla Family, and no longer affiliate [sic] himself with the organization . . . ." *Id.*

one-time error in implementing a prison regulation without more, however, especially in light of documented institutional safety and security concerns and the subsequently placed mail cover procedure, simply does not rise to a claim of constitutional magnitude.[11] Accordingly, the Court will grant the Defendants Motion for Summary Judgment as to this claim.

## CONCLUSION

Based on the foregoing, the Court will GRANT the Defendants' Motion for Summary Judgment and DENY the Plaintiff's Cross-Motion for Summary Judgment. A separate Order follows.

3/2/15
Date

William D. Quarles, Jr.
United States District Judge

---

[11] No constitutional violation has been found, and this Court need not reach the Defendants' qualified immunity defense.

16